FILED IN
4th COURT OF APPEALS
SAN ANTONIO, TEXAS
12/30/2014 4:37:57 PM
KEITH E. HOTTLE
Clerk

# APPENDIX - TAB D

# In the Matter Of:

## SALAS VS. C&B WHITE SERVICES

13410

# ROBERTO MORENO CASTILLO

*January 16, 2014*



EXHIBIT D

800.211.DEPO (3376)
EsquireSolutions.com



204

**Page 1**

CAUSE NO. 13410

MARISELA G. SALAS,    *    IN THE DISTRICT COURT OF
individually AND AS    *
REPRESENTATIVE OF THE    *
ESTATE OF MARTIN SUAREZ    *
AND AS NEXT FRIEND OF    *
KEYLA MARIZEL SALAS    *
SUARES, minor    *

VS.    *    GILLESPIE COUNTY, TEXAS
   *
C&B WHITE SERVICES, INC.,*
ALLEN KELLER CO., 1 LLC    *
d/b/a ALLEN KELLER CO.;    *
ALLEN KELLER CO. SAFECO    *
INSURANCE COMPANY OF    *
AMERICA    *    216TH JUDICIAL DISTRICT

* * * * * * * * * * * *
VIDEO/INTERPRETED/ORAL DEPOSITION
OF
ROBERTO MORENO CASTILLO
JANUARY 16, 2014
* * * * * * * * * * * *

**Page 2**

VIDEO/INTERPRETED/ORAL DEPOSITION OF ROBERTO MORENO CASTILLO, produced as a witness at the instance of the Defendant, Allen Keller, and duly sworn, was taken in the above-styled and numbered cause on the 16th of January, 2014, from 11:00 a.m. to 2:15 p.m., before RHONDA HOWARD, CSR in and for the State of Texas, reported by machine shorthand, at the offices of Zachary P. Hudler, P.C., 100 East Pecan, Suite 1, Johnson City, Texas, pursuant to the Texas Rules of Civil Procedure and the provisions stated on the record or attached hereto.

**Page 3**

APPEARANCES

FOR THE PLAINTIFFS:

Mr. Michael G. Sawicki
SAWICKI & LAUTEN, LLP
4040 N. Central Expressway, Suite 850
Dallas, Texas 75204
(214) 468-8844
msawicki@sawickilauten.com

FOR THE DEFENDANT, ALLEN KELLER CO., ET AL:

Mr. Erik R. Wollam
LUCERO WOLLAM, PLLC
13590 Ranch Road 12
Wimberley, Texas 78676
(512) 485-3500
ewollam@flwlawfirm.com

FOR THE DEFENDANT, C&B WHITE SERVICES, INC.:

Mr. Zachary P. Hudler
LAW OFFICES OF ZACHARY P. HUDLER, P.C.
100 East Pecan, Suite 1
Johnson City, Texas 78636
(830) 868-7651

THE VIDEOGRAPHER:

Ms. Shari Riddle

THE INTERPRETER:

Mr. Tomas Leon

ALSO PRESENT:

Mr. Casey White

**Page 4**

INDEX

Appearances    3
Change Page    98

EXAMINATION

Examination by Mr. Wollam    6
Examination by Mr. Sawicki    48
Examination by Mr. Hudler    79
Further Examination by Mr. Wollam    82
Further Examination by Mr. Sawicki    89
Further Examination by Mr. Hudler    95
Further Examination by Mr. Sawicki    96

SIGNATURE SHEET    99
REPORTER'S CERTIFICATION    100

EXHIBITS

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| 1 | DPS REPORT | 5 |
| 2 | PHOTOGRAPHS | 5 |
| 3 | PHOTOGRAPHS | 5 |
| 4 | PHOTOGRAPH | 56 |



Page 13

as July 11th, 2012. Is that correct?

A  Yes.

Q  The police are not certain, based upon their report, of exactly what time it occurred, but they say 6:36 a.m., approximately. Does that sound correct to you?

A  Yeah, it was about that time more or less.

Q  It was at the very beginning of your day?

A  Yes. We were going -- getting started to work.

Q  And the police also record your full name as Roberto Moreno Castillo?

A  Yes.

Q  With a date of birth of October 15th, 1974?

A  Yes.

Q  And that you live on -- or at 612 Rosemary in Seguin, Texas?

A  Yes.

Q  The officer indicates in his report - this is Trooper Neumann - that you were familiar with the roadway?

MR. SAWICKI: Objection; form.

A  We'd been working on it for some time.

Q  (By Mr. Wollam) How long had you been

Page 14

working in the area where the accident occurred?

A  About a month, I think.

Q  This is an area that you knew well?

A  Yes.

Q  Who was -- were you the leader of the crew?

A  Yes.

Q  Who was on your crew?

A  Sergio Garcia, Sergio Hernandez, Geraldo Ramirez and Martin.

Q  What work was your crew doing in general? How would you describe it?

A  You mean what was our assigned job?

Q  The scope of your work.

A  We were doing concrete work, cement.

Q  Were you doing concrete work for the guardrails?

A  Yes.

Q  Were the guardrails already in place?

A  Yes. We were doing the -- you know, the -- the cement base work.

Q  Is this -- correct me if I'm wrong. This is not where the cars drive. This is underneath the guardrails off the road?

A  It's on the shoulder. It's join -- at the

Page 15

edge of the road.

Q  Did you guys pour the cement?

A  Yes.

Q  Did you work the cement to make it smooth?

A  Yes.

Q  What were the other -- what else would you do other than that work for the concrete?

A  Well, you know, we had to cut in and dig a little ditch in order to set the 2 x 4s that were part of the form into which we poured the cement.

Q  And how long have you personally been doing this kind of work for guardrails on the road?

A  It's not just pouring cement that we've done. I mean, I do sidewalks. And I've been doing this for 15 years.

Q  Okay. For the work on 1623 was part of your crew's work also to put the signs out at the beginning of the workday?

A  Yes.

Q  Was that always the case for the month or so you were on the job?

A  Yes.

Q  Was your crew also responsible for picking up those signs at the end of your workday?

A  Yes.

Page 16

Q  And when I say the signs, it's the signs that we see in Exhibit 3, these pictures. Correct?

A  Yes.

Q  And are the signs to be placed next to the road before the area where your men are working that day?

A  Yes.

Q  Is it your understanding that the purpose is to tell motorists that your crew is ahead and to slow down?

A  Yes.

Q  And the work -- doing concrete work on the roadway and placement of the signs before your work, is that something you've done for many years?

A  Yes.

Q  It's something you knew how to do before this job on 1623?

A  Yes.

Q  And is it something you knew how to do as far as where to place them?

A  Yes. And I've been told that.

Q  I'm sorry. What?

A  And I had been told that.

Q  On jobs before 1623?

A  Yes. And for that one, as well.

Page 17

Q   Okay. I'm looking at the officer's report. They indicate that your crew had picked up the signs that we see in the photographs shortly before the accident?

THE INTERPRETER:  Picked up from the ground?  Picked up -- I'm sorry.  Just to clarify the question.

MR. WOLLAM:  Had collected the signs. How about that?  Okay.  So I'll ask the question again.

Q   (By Mr. Wollam) The police report indicates that your crew had collected the signs shortly before the accident?

A   Yes.

Q   Where did you get the signs?

A   We had them and there was a work -- an area where we -- where we picked them up every morning before going out to set them out at the work site.

Q   And is that the same area you returned the signs at the end of the workday?

A   Yes. Yeah.

Q   And were there other materials stored in this area for the work being done on the roadway?

A   There was the signs there.

Page 18

Q   When your crew was doing the work, was there any other road construction activity taking place in that month?

A   There were also some people from another company called Keller, I think.  They were working there.

Q   Were they working on the -- not just the day of the accident, but in the month period of time, they were working in the same stretch of roadway?

A   Yes.

Q   What was your understanding about what the Keller men were doing as far as their work?

A   Working.

Q   What type?  Were they --

A   Construction work, also.

Q   Okay.  Were they doing concrete around the barricades?

A   They were doing work with a bobcat.

Q   And backhoes?

A   Yes.

Q   Were they working in different areas up and down the road than your crew was in that month?

A   That's right.  Yes, they were.

Q   You're -- you weren't working right in the

Page 19

same location with the Keller people every day. Correct?

A   We were not.

Q   Separate places?

A   Yes.

Q   After you picked up the signs that morning, what was your intention about what you were going to do the first thing, first crew?

A   Set up the signs in order to be able to start work.

Q   How far was the area where the signs stayed overnight to the area where the men fell from the truck?

A   About 200 feet, more or less.  I don't remember exactly, but it was very close, not far away at all.

Q   How many signs did your crew collect that morning?

A   That was the first one.  We were setting -- we were starting to set them up.

Q   I'm not -- okay.  I'm not sure I understand your question [sic].  I'll ask another one -- or your answer.

How many signs -- let me put it this way, looking at Officer Delgado's report on Page 2 of 3,

Page 20

he indicates that you told him that you picked up three road signs and put them in the back of the truck that morning.  Is that correct?

MR. SAWICKI:  Objection; form. Objection to form.

A   Yes, this one, pointing to this exhibit, that was a big one.

Q   (By Mr. Wollam) Okay.  So the first photograph of Exhibit 3 is -- is that actually one of the signs that was placed in your truck moments before the accident?

A   Yes.  That was the one that was on the top.

Q   And I see a sign on the ground in the background of that photograph.

Was that also one of the signs that was in the back of the truck?

A   I don't recall that exactly right now. But this big one, yes.

Q   And these were the same signs your crew used every day?

A   Yes, yes.

Q   I'm going to number the photographs on Exhibit 3.

Looking at Page 4 of Exhibit 3, there's



Page 21

another picture further [sic] away.

A   Yes.

Q   Looks like three -- three signs, two on the ground and one standing.

A   Yes. These two were the ones that were under -- under the -- the two that are on the ground are the ones that were collapsible. They -- they -- they have to be assembled. They -- they come in parts.

And the -- the large one that's already -- that -- that appears here, that is -- that one comes in a -- as one piece.

Q   And did these appear to be the three signs that your crew loaded in the truck moments before the accident?

A   I believe so.

Q   Were there any other materials in the back of your pickup truck other than the signs?

A   There was none.

Q   Who placed the signs in the back of the truck?

A   We did.

Q   Everyone on the crew that you named?

A   Yes. The whole crew.

Q   Explain how the signs were placed inside

Page 22

the truck. How were they stacked or placed?

A   They were stacked one on top of another.

Q   And then what did you do with the sign that has the -- that's standing in the photographs?

A   That one was at the top and it was -- you know, it was the first one that we were going to set up.

Q   Did you lay -- did your crew lay it flat in the truck?

A   Yes. And the -- the -- the four legs were standing -- were hanging off the back of the bed of the truck.

Q   Was the tailgate up or down?

A   It was raised. It was up.

Q   So the stand of the standing sign was on top of the raised tailgate?

A   Yes. They were -- the -- the four legs were sticking out the back.

Q   And we are speaking of the way the signs were loaded on the day the accident happened. Is that correct?

A   Yes.

Q   There -- were there any other construction crews at the location where the signs were stored on the morning your men loaded the truck?

Page 23

A   No.

Q   No Keller people were there?

A   They had not arrived yet.

Q   And there were no other construction people in the area from the place where you loaded the signs to the location where the accident occurred. Is that correct?

A   No.

Q   No one from Keller saw your men that morning loading signs or on the roadway. Is that true?

A   No. They had not arrived yet.

Q   Did you discuss and tell your men where you would be placing the signs and in what order, or is that something that everyone is familiar with?

A   No. We were going to put them up in order.

Q   The same way you had done it many mornings?

A   Yes.

Q   This is not something you guys had to go over in detail and talk about?

A   That's right.

Q   Everybody knew what to do?

A   Yes.

Page 24

Q   Had you on the first day instructed the men on how to place the signs?

A   They had -- it had already been explained to us.

Q   Explained to you by Casey?

A   Yes.

Q   You took your direction from Casey on where to place the signs. True?

A   Yes. We already knew.

Q   Because you had done this kind of work on other jobs?

A   Yes.

Q   You didn't -- Keller didn't tell you where to put the signs. True?

A   It was a person from Keller that had told us how he wanted the cones placed, because we put place -- cones out, you know, on the day that we were going to pour concrete. And one of the persons from Keller told us that we needed -- that -- that they wanted us to have more space before we set the first cone in the place we were -- between the placement of the first cone and the -- and the place where we were going to pour the concrete. So they moved them for us. That -- that, they had done.

MR. WOLLAM:   Nonresponsive.

Page 25

Q (By Mr. Wollam) There's a difference between cones and these signs we see in the pictures. True?

A That's correct, yes.

Q Cones are the tri -- are the pointy things that go on the roadway?

A That's right.

Q When you're talking about cones is it what I see in the very distance --

A Yes, those are cones.

Q Exhibit 3, Picture No. 4, in the distance -- there's a cone in the distance of the photograph. Correct?

A That's right.

Q Separate cones.

On the day of this accident no one from Keller told your men how to place the signs in the truck. True?

A No. We already knew where we wanted -- where we had to put those up.

Q No one from Keller told you how to put the signs and stack them in your truck that morning. True?

A No.

Q No one from Keller told your men --

Page 26

THE INTERPRETER: No one did. You asked.

MR. WOLLAM: Okay. Did you get it?

THE REPORTER: Uh-huh.

Q (By Mr. Wollam) No one from Keller told your men where to place themselves either in the cab or in the bed of the truck or on the bumper that morning. True?

A Correct.

Q They weren't there?

A There was no one.

Q And as you've explained, that morning, like other mornings, your men knew where to place the signs. True?

A Yes.

Q They knew where to place the signs, because that's something that you had been instructed to do by Casey White. Correct?

A That's right.

Q Had your men placed any signs on the roadway before the men fell?

A We were going to start.

Q No signs had come out yet?

A We had not.

Q Which members of your crew were inside the

Page 27

truck with you in the cab?

A Sergio Garcia was and Geraldo Ramirez.

Q Who was in the back of the truck?

A Sergio Hernandez and Martin.

Q The police report indicates you woke up about 5:00 o'clock that morning?

MR. SAWICKI: Objection; form.

A Yes.

Q (By Mr. Wollam) Where did you pick up each of the men for work that day?

A At their homes.

Q What town or city?

A Some in Seguin, some in San Marcos.

Q And what time did you leave your home?

A About ten minutes after 5:00.

Q Where did you pick up Martin?

A In San Marcos.

Q Did anybody else have their own vehicle and follow you to the work area?

A No.

Q On the way to Blanco was everybody in the cab?

A Yes.

Q No one was in the back of the truck until you had retrieved the signs. Is that correct?

Page 28

A That's right.

Q Your crew was working for C&B White Services. Is that correct?

A Yes.

Q Had you worked for Mr. White on other jobs prior to the one on 1623?

A Yes.

Q How long have you been working with Mr. White in the past?

A About three or four years. Yeah, three or four years.

Q Do you still work with him?

A We -- there is no cement work from him right now.

Q From the area where your men picked up the signs to the area where the accident happened, how fast were you driving the truck?

A Perhaps 20. I mean, there -- no, it was -- yeah, no more than -- than -- than 20. I had the -- the -- the flashers -- the emergency flashers lit.

Q Were there any other vehicles on the roadway?

A No one.

Q Were there any -- is there a home located



Page 29

near the area where the accident happened?

A There is.

Q Do you know if there was anybody at the home who saw the accident happen?

A No one did.

Q The only -- as far as you know, the only witnesses were your men on your crew?

A That's right. Yes.

Q The police report indicates that Martin and Sergio were standing on the bumper when they fell?

MR. SAWICKI: Objection --

Q (By Mr. Wollam) Is that true?

A They were like -- they had one foot on the -- on -- on that fender and one foot inside the bed. They were like riding on the -- on the gate, on the tailgate.

Q One foot on the bumper, one foot in the bed?

THE INTERPRETER: What I said -- when the interpreter said fender, fender and bumper as used in Spanish tend to be synonomous.

MR. WOLLAM: Thank you.

THE INTERPRETER: Yes. One foot on the bed and one foot -- foot on the -- on the

Page 30

bumper.

Q (By Mr. Wollam) Did you know they were in that location when you started driving down the road?

A Yes. As I was driving, I could see them in the rearview mirror.

Q Trooper Neumann's report on Page 5 says that, "Normally the men sit in the rear of the truck when placing signs."

A That's correct.

Q Normally they would sit in the truck while you drove from one spot to the next?

A That's right.

Q And when I say sit in the truck, I'm talking about sitting in the bed of the pickup. Is that correct?

A Correct.

Q On this morning the men were sitting with one foot on the bumper, one foot in the bed and straddling the tailgate?

A That's right.

Q That's the first time you had seen them do that. Is that right?

A Yes.

Q Did you tell them to sit that way?

Page 31

A No. I told them to sit on the inside, and they didn't -- they refused to. I had told them to sit inside the bed, and they said they would. But once I got started, I noticed that they had not sat inside the bed, that they were just straddling the tailgate. That's why I was driving so slowly.

Q You instructed them to do what they normally did. Is that what you're telling me?

A I had told them to sit inside the cabin with us, and they didn't want to sit in the cabin.

Q And when your men on other days were placing signs, would they -- would everybody normally sit in the cab of the truck as you proceeded down the roadway?

A Generally they would.

Q And if it's not the generally [sic], where they're in the cab, if they were in the bed they would be inside the bed, sitting?

A All the time inside -- inside the bed of the truck.

Q This is the only time they stood with a foot on the bumper?

A Yes.

Q And they did so after you had instructed them to be inside the cab?

Page 32

A Yes.

Q And you did not notice their position until you were already driving?

A That's right. That's when I saw them on the mirror [sic].

Q The police report by Trooper Neumann on the last page says that a gust of wind caught one of the signs in the back of the truck.

A That's right.

Q Was the wind, to your knowledge, from the speed of your vehicle or something from nature, from the weather?

A It was -- it was windy weather. The -- the -- it was weather-related.

Q Did you feel the gust of wind as you were driving before you realized what was happening in the back of the truck?

A I was -- I was paying attention, you know, looking out for the -- what was happening in the back, using my mirror. And that's when I noticed that the wind lifted the sign, and I saw them fall off the back. I stopped immediately.

Q Was it the sign that we see standing in the pictures that was lifted?

A Yes.



Page 33

Q What is -- do you know the material that the sign is made of itself where the letters are?

A It's some kind of a -- it's -- it's some kind of a material, cloth of some kind or another. And the base is all made of metal. It's -- I believe it's iron. I don't know. But it's very heavy.

Q The sign itself is heavy?

A Yes.

Q But the material where the letters are is a fabric?

A Yes.

Q Were you surprised by the gust of wind?

A Oh, yes. Yeah. It came up suddenly on us.

Q Did you watch the sign lift and strike the men or what did you actually perceive and see?

A Yes, I saw it. And I saw it -- them -- push them off.

Q Could you tell what part of the sign came into contact with the men?

A It was the fabric -- the -- the -- where the words are came up.

Q The policeman, Trooper Neumann, on the last page of his report indicates that the sole

Page 34

factor for the accident was the decision of the men to ride where they were on the bumper.

Do you agree with this?

A Yes.

Q At the time -- let me ask you this.

In between the time when you started moving from the area where the signs had been placed in the truck --

MR. WOLLAM: Go ahead.

Q (By Mr. Wollam) -- until the area where the sign was lifted by the wind, did you ever receive any signal from the men in the back of the truck of any kind, verbally, anything?

A No, nothing. They were -- they were fine.

Q Did they bang on the truck and tell you to slow down or something like that?

A No, nothing. Nothing.

Q Did you see them gesture with their hand for you to slow down?

A No, nothing. Everything was fine.

Q Did you hear them trying to communicate verbally with you, yelling at you, anything?

A No, nothing.

Q Were your windows up or down?

A They were -- all the windows were down.

Page 35

Q Radio on?

A No. The radio was off.

Q So you would have been able to hear them if they had tried to talk to you?

A Yes.

Q They were -- the men on the back of the truck, including Martin, were aware that you were going to drive down the road to place the signs?

A Yes.

Q And they chose to remain in the position they were in?

A Well, yes.

Q Despite what you told them?

A Yes.

Q To be in the cab or sitting in the bed?

A That's right, yes.

Q After the accident, when people were investigating, did you ever talk to a person who had a tape recorder?

A Yes, the people from OSHA.

Q Only OSHA?

A Yes.

Q Did anyone doing an investigation ask you to write in your own words on a piece of paper what had occurred?

Page 36

A No.

Q When your men completed their work on a daily or weekly basis, was it Casey White that paid you?

A Yes.

Q And he's the one that reviewed and approved your work that you had done in order to pay you?

MR. HUDLER: Objection; form.

A That's right, yes.

Q (By Mr. Wollam) Do you know of any person or department who investigated the accident other than DPS, Blanco Sheriff and OSHA?

A I'm not understanding.

Q I just want to make sure that every person or department that has investigated this accident I know about. So I've got to ask you what you know.

A There was no one else.

Q Have you been contacted and asked questions by anybody who has told you that they are working for Martin's family?

A No.

Q Did you personally take any photographs of the accident or your truck or anything like that?

A No.



Page 37

Q   Did you fill out an accident report in writing of any kind for anyone?

A   No.

Q   Was the gust of wind the first indication that you had that the accident was happening?

A   Yes.

Q   Do you believe that the area where the signs are located in these pictures is the area where the accident happened like we see in Picture 4 of Exhibit 3?

A   Yes.

Q   Would any of these photographs show us the area where you brought your truck to a stop?  And you can look at --

A   Here where my finger is, that's about where the guys fell.  And I stopped right there.

Q   Using the cone that is in the distance in Picture 4 of Exhibit 3, could you tell me where your truck came to a stop relative to that cone?

A   About this -- just before -- I mean -- and I stopped immediately.  I mean, we -- we stopped -- we all got off right -- right there.  We all ran off the truck to see -- to see the guys.

Q   Did the sign that the wind caught continue and leave the bed of the truck before you stopped?

Page 38

A   It did.

Q   Did the other two signs remain in the bed?

A   Yeah.  We put -- we -- we took those down. We did it.

Q   You took them out of the bed of the truck after the accident?

A   Yes.  A lot later.

Q   Okay.  The other two signs I see in Picture 4 of Exhibit 3, they weren't blown out by the wind.  Is that true?

A   No.  I mean, they were laying at the bottom of the -- of the -- on -- on the bed of the truck.  And the -- the stands -- the stands on which they are assembled onto to stand, this bottom metal piece, those were laying on top of the two signs weighing them down.

Q   Once you brought your truck to a stop, what happened?  What did you all do?

A   We ran to help the guys and -- startled. And I called -- I brought them back onto the truck, called -- got on the phone to ask for help, called 911.  Then I called Casey.  And then we went to Blanco to ask for help.

Q   The sign that the wind caught, when it came completely out of the truck, did you leave it

Page 39

there at the area of the accident as you went to Blanco for help?

A   We just moved it off -- off the roadway.

Q   So when it came out of the bed of the truck did it land on the paved section of the roadway?

A   It was on the pavement.

Q   And then your men moved it out of the roadway before you left for Blanco to find help?

A   Yes.

Q   Is that when your men removed the other two signs and placed them in the same area?

A   We didn't do that until we came back.

Q   And you came back -- did you come back later that same day, that morning?

A   I came back with the Sheriff's officer.

Q   Delgado?

A   Yes.

Q   And that's when the signs were removed from your truck?

A   I came back with the Sheriff's officer and the guys brought my truck back.  And when they got there is when they took the -- the signs off the -- off the bed of the truck.

Because I had been explaining to the

Page 40

Sheriff's officer what had gone on.

Q   Your crew didn't work that day.  They went to check on the other men.  Right?

A   No.

Q   You didn't work?

A   Not that day.

Q   You guys went to check on the men?

A   Yeah.  They got taken to the hospital, yeah.

Q   Did you ever return to the scene with anyone other than Delgado?

A   Just with Delgado.

Q   When you stopped the truck and got out did you go see Martin Suarez?

A   Yes.

Q   Did he ever speak?  Did you hear him speak words?

A   No.

Q   Did he ever communicate to you in a nonverbal manner, with his hands or anything?

A   No.  He was just breathing hard.

Q   Did he appear to you to be unconscious?

A   That's why -- yeah.  That -- I mean, we were scared.  And that's why we picked him up and put him in the truck to take -- to go off to seek



800.211.DEPO (3376)
EsquireSolutions.com

Page 41

help for him. I mean, we didn't stick around and wait for anything. We -- we figured we needed to get him to help forthwith.

Q   Where did he -- where was he laying when you first got out of your truck and -- and found him?

A   On the roadway, on the pavement.

Q   And the other man on the back of the truck, was he also on the pavement?

A   No. He stood up -- he stood -- he had stood up and -- when we ran there, he was already standing at the side of the road.

Q   Using the driver's side and passenger's side of your truck, who was situated on the driver's side of the tailgate, who was situated on the passenger's side of the tailgate?

A   Martin was on the side -- on the chauffeur's side, on the driver's side. And Sergio was on the other side, on the passenger's side.

Q   Did the policeman issue you any tickets?

A   No.

Q   Officer Delgado did not blame you for this, did he?

A   He was not. He -- he told me it had been an accident.

Page 42

Q   And did you ever speak or communicate with Delgado's help directly with Trooper Neumann?

A   It was with Casey's help. Casey was telling me what it was that the fellow was asking.

Q   Was -- and when you spoke with Trooper Neumann, was it the same day of the accident or the following -- any day following?

A   It was on that day. And there was also a sub -- a follow-up -- another talk with a guy on a subsequent day.

Q   Do you believe that Trooper Neumann ever told you or indicated that you were to blame?

A   I believe he said it was an accident.

Q   Setting this accident aside, focusing on your work history, do you have any certifications for the construction work that you do, any sort of license or...

A   No. That's been my work since I was in Mexico.

Q   While you were on this job for that month did you also see an inspector for TX-DOT?

A   Yes.

Q   Was that a person that you could speak with? Did he speak Spanish, as well?

A   He spoke a little of it.

Page 43

Q   Did that TX-DOT man ever make any complaints about your crew that you were aware of?

A   No, nothing. Nothing at all.

Q   Did he ever give you an instruction or reprimand about placement of the road work signs?

A   Nothing.

Q   And the truck that we've been discussing is your truck. Correct?

A   That was mine.

Q   And the tools that your crew worked belonged to you or your crew members?

A   Each guy owns his tools. They each have their work bag, their toolbag.

Q   Keller didn't give you guys any equipment or tools. Correct?

A   No.

Q   And there were no cones in the truck on the morning of this accident?

A   No, there weren't any.

Q   And the only time you had any discussion with anyone from Keller as it related to the warning materials was cones on some other part of the project. Is that correct?

A   The -- on the days that we were going to pour cement we would set up the cones in order to

Page 44

block off the lane. And the guys from Keller would come and would move them to give them more space between each cone, because they kept saying that we were putting them too close together.

Q   Was this something that transpired long before or many days before the signs fell from the truck or the sign fell from the truck?

A   It happened several times. And the -- immediately -- the -- the last time it had happened had been at least a week before the day of the accident.

Q   And it was in a different area than where the sign blew out of the truck?

A   Yes.

Q   And that's the only time that you ever had any discussion with Keller people about cones or signs. Correct?

A   Yes.

Q   They never made any comments to you about the road signs that we see in the pictures that were involved in the accident. True?

A   No.

Q   No instruction from Keller on how to put them in your truck. Correct?

A   No.



Page 45

Q   Where your men should ride while you're putting them out.  Correct?

A   No.

Q   And no one from Keller told you how to do your concrete work --

MR. SAWICKI:  Sorry.

Q   (By Mr. Wollam) -- correct?

A   No.

Q   You're not involved in the business dealings between Mr. White and Keller, are you?

A   I'm not.

Q   You worked for C&B White.  Right?

MR. HUDLER:  Objection; form.

A   Yes.

Q   (By Mr. Wollam) Who did you work for on this project?

MR. HUDLER:  Objection; form.

A   For Casey, for CBS.

Q   (By Mr. Wollam) How long had Martin Suarez been working with you?

A   About a month.

Q   Had you known him at all before that?

A   No.  Someone gave me his number, told me that this guy wanted work, and he talked to me.

Q   Was he a good worker?

Page 46

A   Yeah.  He was a good helper.

Q   And what were you paying him?

A   $150 a day.

Q   And were you paying him or was Casey paying him?

A   I would -- I would, you know, charge Casey enough money to pay my guys.

Q   Do you know if Martin Suarez was a documented worker or resident of the United States?

A   He was not.

Q   And what was -- 100 -- you said 150 a week for him?

A   150 a day.

Q   And is that the same you paid everybody on your crew?

A   Yeah.  One of the guys only 120.  150 for the rest.

Q   So the most you would be able to pay him for the work he was doing, even if he was with you for many years, would be 150 a day?

A   No.  He'd get a -- a pay raise once he learned the job better.

Q   Okay.  And he was learning the job through you?

A   Yes.

Page 47

Q   To your knowledge, had he done work like the work you guys were doing on a highway before you?

A   He had not.

Q   So you were instructing him on how to do that work?

A   Well, the whole crew was, you know.  Everybody was helping teach.

Q   In that teaching process, did it include the safety of this work, as well?

A   Yes.  Casey had told us about that, you know, everything that we needed to do before we started working there.  We had to have the vests.  We had to have the helmets.  We had to have the goggles.  We had to have the boots.  You know, the goggles, the skirts -- not skirts.  The vests, the hard shoes.

Q   Safety was important?

A   Yes, yes.

Q   And you passed that to your men?

A   Yes.  Every morning in the morning to all the guys, checked them out.

MR. SAWICKI:  I'll pass the witness.  Thank you for your time, sir.

MR. HUDLER:  Can we take a quick --

Page 48

quick break?  He needs to use the restroom.

MR. SAWICKI:  Sure.

THE VIDEOGRAPHER:  We are off the record at 12:34.

(Off the record from 12:34 to 12:43)

THE VIDEOGRAPHER:  We are on the record at 12:43.

EXAMINATION
BY MR. SAWICKI:

Q   Mr. Moreno, my name is Mike Sawicki.  I represent Martin's family.  Okay.  Have we spoken before today?

A   No.

Q   All right.  I have a few questions after Mr. Wollam's questions.  Okay?

A   De nada.

Q   First off, the signs -- the signs that we see in Exhibit 3 and the subsequent pictures, were those signs something you got each morning as part of the work you did?

A   Yes.

Q   Were those signs Casey White's signs?

MR. WOLLAM:  Form.

A   No.  I think they're Keller's.

Q   (By Mr. Sawicki) My next question was

Page 57

A   I don't recall, because -- I mean, the only one that actually flew off, or that, you know off -- or fell off the truck was this one.

THE INTERPRETER:  Again, the witness is indicating the -- the Page 1 of Exhibit 3 that is standing.

MR. SAWICKI:  Okay.

Q   (By Mr. Sawicki) With respect to Exhibit 3, No. 2, does there appear to be broken wood in the top of the base in the center of that photograph?

A   Yes.

Q   Can the sign be placed into that base with the broken wood that you see there?

A   No.

Q   When did that wood get broken inside the base that you see there in Exhibit 3, Photo 2?

MR. WOLLAM:  Form.  Form.

A   I don't know that -- I -- I don't recall it happening.

Q   (By Mr. Sawicki) Do you have any explanation for how this occurred?

A   No.

Q   Was this the condition that the sign was in when you picked it up from Allen Keller that

Page 58

morning?

MR. WOLLAM:  Form.

A   Yes.  We just picked up the parts that were there and put -- placed them inside my pickup truck.

Q   (By Mr. Sawicki) Now, with respect to -- strike all that.

With respect to Martin, how long had he been working for you?

A   About a month.

Q   How much prior experience did he have, to your knowledge, working on roadway construction?

A   I don't know.

Q   How did you test his knowledge of -- his awareness of safety rules for roadside construction?

A   Because he understood everything.  I mean, he did everything that we were asking -- that -- that was asked of him.

Q   With respect to the crew working on the day of Martin's fall, who was in charge of making assignments to Martin to do particular tasks?

A   I was when I was there.

Q   If you saw Martin -- Martin doing something you didn't want done, did you have the power to tell him to stop?

Page 59

A   Yes.

Q   In the past, in the month or so that he had worked for you, did Martin follow your instructions?

A   Sometimes he did, sometimes he didn't.  But, like, sometimes, you know, he -- he -- he was reluctant to put on the gloves or the -- or the goggles.  But I would just tell him, "It has to be done."

Q   With respect to the crew working that day, who was the person in the most senior leadership position?

A   From those of us that were there working that day?

Q   Yes, sir.

A   Well, it was I.  I mean, we were all working together, but we -- you know, there was not one person acting as a foreman.  We were all working together.

Q   Who decided how much an individual like Martin got paid?

A   Casey would.

Q   So did Casey White set the 150-dollar-a-day payment Martin was receiving?

A   Yes.

Page 60

Q   Now, in speaking with Mr. Wollam, you said that Miss -- Martin might get a raise once he learned the job better.  Do you recall that testimony?

A   Yes.

Q   What did Martin need to learn better to get a raise?

A   About working with concrete, with cement.

Q   With respect to Martin, do you know if he ever did concrete work before this project?

A   He had told me he had -- he told me he had.

Q   Did he tell -- did Martin tell you he had ever worked on a roadside construction project before?

A   He never told me.

THE INTERPRETER:  The interpreter asked the witness to clarify his answer as to whether he meant no, he never told me or no, he never worked.  And the reply of the witness is no, he never told me.

Q   (By Mr. Sawicki) Do you, sir, have any knowledge about whether Martin had actually worked on a roadside construction project before this job?

A   I don't.



Page 73

individuals is?

A One of them is someone from Dolores (phonetic), and also from Guawajuato. I don't know; they're from different states.

Q With respect to Sergio Garcia, when was the last time you would have spoken with him?

A Sergio Garcia, about three or four months ago.

Q Do you know how to contact him today?

A I don't. I have -- I have -- I have lost track of him.

Q Do you know anyone in this area in Texas that knows how to contact Sergio Garcia?

A No. I mean, we -- we've known each other, acquaintances, but not more.

Q Do you know why he left the United States?

A No. Those were personal things, and I don't know.

Q Was he here legally at the time of the 2012 fall of Mr. Martin?

A No.

Q Do you know where Geraldo Ramirez is today?

A He's in Mexico.

Q Do you know anyone locally that knows how

Page 74

to contact him?

A He lived with other roommates, and I know they've all gone.

Q Do you know -- when was the last time you spoke with Mr. Ramirez?

A Eight or nine months ago. Maybe longer. I don't know.

Q And do you know why he left the United States?

A To go back to see his family.

Q In 2012, was he here legally?

A He had a Social Security card, but I don't know if it was -- I don't know if it was a good one or not.

Q Okay. The next person was Sergio Garcia Hernandez. When was the last time you spoke with him?

THE INTERPRETER: Forgive me, Counsel. I -- Sergio Garcia Hernandez is the same person as Sergio Hernandez?

MR. SAWICKI: I have another individual listed on the police report of Sergio Garcia Hernandez.

Q (By Mr. Sawicki) Who is that?

THE INTERPRETER: I -- I just had one

Page 75

last name and then another one as Hernandez. And when you brought up this was the combination of the two last names, I had quite caught it, which is the reason why I questioned you.

MR. SAWICKI: Sure, sure.

A Sergio Garcia alone is the father. Sergio Garcia Hernandez is the son.

Q (By Mr. Sawicki) Okay. And when is the last time you spoke with him, the son?

THE REPORTER: Spoke with him what?

MR. SAWICKI: The son.

MR. WOLLAM: Yeah.

A Him, must be a year. I haven't heard from him since.

Q (By Mr. Sawicki) Do you know where he is today?

A No.

Q Do you know anyone in the area that knows how to get in contact with him?

A No. There were acquaintances here. I don't know where to -- where -- where they've gone.

Q Was he here legally in 2012?

A He was not.

Q And forgive me, who is Cesar Moreno?

A My brother.

Page 76

Q Prior to the job that Martin was injured and -- and died on, had Martin worked for you on any other job?

A No. He only started working with me on this one.

Q Did you provide him with any kind of formal safety training?

A Just what I told him about the things he had to wear that were all safety reasons.

Q Was he on any kind of trial period? In other words, starting working for you this one job, was he under any kind of...

A No. We all worked. I mean, there -- there were -- we had work to do, and we all worked together. And, you know, he was working for me and with me.

Q How did you evaluate Martin's knowledge of how to perform the job that he was working on with you?

A He was doing well.

Q After he fell -- oh, I'm sorry. Do you have any formal education?

A I completed ninth grade.

Q What is your current address?

A 1414 Hidalgo Street in Seguin, Texas.



Page 77

Q   Do you live there with anyone -- anyone else?

A   My wife and my son and my daughter.

Q   Do you have any plans to move in the near future?

A   No. I -- I got my work here. I've got the family here. No.

Q   Do you recall speaking with OSHA about this incident?

A   Yes.

Q   Did they express to you any concern -- did OSHA express to you any concerns about your actions that day?

MR. HUDLER: Objection; form.

A   No.

Q   (By Mr. Sawicki) Are you aware of any of the citations OSHA issued regarding this incident?

MR. HUDLER: Objection; form.

A   No, but I think that there was a fine -- some kind of a fine that they -- that they imposed on Casey.

Q   (By Mr. Sawicki) Do you know anything about what those fines were?

MR. HUDLER: Objection; form.

A   I don't know.

Page 78

Q   (By Mr. Sawicki) After this incident, did you have any conversations with Mr. White about how the fall occurred?

A   Yeah. I explained to him how it was that it had happened.

Q   Did you have any discussion with Mr. White about how to prevent similar falls in the future?

MR. HUDLER: Objection; form.

A   Well, just, you know, that -- that we had -- everybody had to be more careful about and avoid certain things.

Q   (By Mr. Sawicki) What things?

MR. HUDLER: Objection; form.

A   Nobody riding in the back of trucks and, you know, the -- general safety mentality.

Q   (By Mr. Sawicki) Since this incident have you continued to operate working trucks with people riding in the back of them?

MR. HUDLER: Objection; form.

A   I have not.

Q   (By Mr. Sawicki) Why is that?

A   On account of what happened. You know, having learned -- having had that experience, I don't want to repeat it. I mean, he was my friend. We all feel very bad about it. We all felt bad.

Page 79

You know, we are all here -- all -- we're all here for work. And, you know, those -- all of us Mexicans are here to find -- to do some work, and we all felt terrible about this.

Q   How have you been able to enforce the new rule keeping people from riding on the tailgate of the bed of a truck?

MR. HUDLER: Objection; form.

A   I haven't been driving trucks for -- for work at this point. In the work that I'm doing, somebody comes and picks me up and takes me out to job sites. I'm not driving.

The kind of work I'm doing -- and you know, anytime I've been at other work sites or at other jobs, I tell people, "Don't do that."

Q   With respect to --

MR. SAWICKI: Actually, I'm going to pass. Do you have stuff?

MR. HUDLER: Just a few.

MR. SAWICKI: I'm going to pass the witness for a moment and go over my outline.

EXAMINATION

BY MR. HUDLER:

Q   Zach Hudler here for C&B White Services, Inc.

Page 80

MR. HUDLER: Can you hear me? Do I need to get a --

Q   (By Mr. Hudler) Mr. Moreno, when we're talking about the construction project at issue, I'm talking about the one where your friend, Martin, passed away. Do you understand that? During -- do you understand?

A   Yes.

Q   During that construction project, at any time did any employee or representative of Allen Keller ask you to move a sign that was placed?

A   No.

Q   No? How many signs were there on that construction project generally?

A   Seven, eight. I don't remember exactly.

Q   Okay. Were there two sets of signs?

A   I think there were -- each set of signs -- each set of signs had either three or four signs to them, you know, workers present, work ahead, slow down, things like that.

Q   Were there any other signs that were being placed during that construction project that were being placed by some -- someone other than you and your crew?

**Page 81**

A    Yeah. When the -- when the Keller guys arrived, whenever -- arrived for work, they would set up additional road signs.

Q    Okay. And were those signs that were set up on that construction project - and I'm talking about all the ones that were out there at all times - were those owned by Allen Keller?

A    Yes.

Q    Okay. And as to the construction crew that you talked about early on this morning, did you make -- did you make the decisions on what their responsibilities would be on a day-to-day basis during that project?

A    Yeah. We already had -- we already knew what it was that we had to do each day.

Q    And you paid your crew directly. Correct?

A    Yeah. Casey would pay me, and I would -- and that would give me the money with which to pay them.

Q    And you're certain that Allen Keller never asked you or your crew to move a sign?

MR. WOLLAM: Form.

A    They never asked.

MR. HUDLER: We'll pass the witness.

FURTHER EXAMINATION

**Page 82**

BY MR. WOLLAM:

Q    I've got some follow-up questions based on the information these gentlemen have covered.

I will be skipping around a little bit.

You had testified that normally your men would sit inside the cab of the truck at the period of time when you were placing signs at the beginning of work.

A    Yes.

Q    You had also indicated that on a few occasions you saw Allen Keller people at the same time your crew was putting out your signs. Right?

MR. SAWICKI: Objection; form.

A    Yes.

Q    (By Mr. Wollam) The times that anybody from Keller would have seen your crew on the roadway in the process of placing the signs, your men would have been in the cab?

A    Yes.

Q    Unless you were stopped and you were actually lifting the signs and putting them on the road. Right?

A    Exactly. Yes. Yes.

Q    Keller would have never seen your men before this riding on the back of the truck. True?

**Page 83**

A    They would not.

Q    Next topic, the area where the signs were kept at night.

When you went to that area in the morning to pick up the signs, there was no one from Keller there giving you the signs. Right?

A    No, there was not.

Q    And in the morning of this accident there was no one from Keller there at the location when you picked up the signs?

A    There was not.

Q    And no one from Keller seeing you load the signs?

A    No.

Q    And no one from Keller watching you drive away from that area towards the area of the accident?

A    No.

MR. WOLLAM: Michael, this one is four. Do you want to attach four as just that individual sheet, or do you want to attach all the DPS photographs?

MR. SAWICKI: I was going to make this a global Exhibit 4, since it's the entire copy.

MR. WOLLAM: I think that would be

**Page 84**

great. It was just on my list.

MR. SAWICKI: Yeah.

MR. WOLLAM: So by agreement of counsel, can we make Exhibit 4 all of the stapled documents --

THE REPORTER: I'll give you another.

MR. WOLLAM: -- instead of this one sheet?

MR. SAWICKI: Yes.

MR. HUDLER: Yes.

MR. WOLLAM: And then when we were discussing photographs in the DPS package with the witness, Mr. Moreno, we were focusing in on what Michael's office has Bates numbered as 398.

MR. SAWICKI: Muchas gracias.

MR. WOLLAM: Thank you for telling him that. It was not a question.

THE INTERPRETER: Unless people keep up with what is going on, they don't catch the next question, like who all was the members of the team and whatnot.

MR. WOLLAM: I appreciate it.

Q    (By Mr. Wollam) Next question. Do you know if Martin was married?

A    I knew he was living with someone, but not



Page 93

Q   Okay. Have you had any formal training about placement of -- or regulations regarding placement of traffic control devices like cones and signs we see in the Exhibits 3 and 4?

A   Well, you know, at the company where I used to work in the past they used to tell us how the -- what the placement of control devices should be.

Q   What was that company?

A   Myers Concrete.

Q   Where are they?

A   In Wimberley.

THE REPORTER: Myers or Mayers?

MR. WOLLAM: Myers. It's M-Y-E-R-S.

THE REPORTER: That's what I thought.

MR. WOLLAM: I don't know much, but I do know that.

THE INTERPRETER: You've seen the sign.

Q   (By Mr. Sawicki) Have you ever seen a written safety policy for Mr. White?

A   No. He would explain to us what it is that he wanted, what we had to be on lookout for and how to do it right.

Q   Have you ever seen a safety checklist?

Page 94

A   I think when I started working with him he had -- there -- there was one such.

Q   When was the last time you had seen it?

A   It must have been at the time that we started this last job.

Q   What was in it?

A   It was some of the things that were going to be needed at a job, you know, make -- making sure that we had a safety meeting and that it had the list of the protective -- you know, the -- the list of protective devices, the -- the goggles, the hardhat, the safety signs, all those things.

Q   Did you ever see Martin review those materials?

A   When we started the job I explained to all the team what the series of things were that we were going to have to adhere by. You know, I told them we needed to wear hardhats, that we needed goggles, you know, check all of our electrical extensions or cords, make sure there were no cuts on them. You know, we had to wear the vests and not get close to the roadside, to -- to the pavement when we were working there, all those things.

Q   From what you saw was Martin's safety training all done on the job?

Page 95

A   Yes.

Q   Okay.

MR. SAWICKI: Pass the witness at this time.

FURTHER EXAMINATION

BY MR. HUDLER:

Q   Mr. Moreno, did Allen Keller ever complain about the distance of the signs that you all were placing?

MR. WOLLAM: Form.

Q   (By Mr. Hudler) And I'm talking about the construction project at issue.

A   No. The only thing they complained about was -- or the only thing they indicated was about the traffic cones.

Q   And, Mr. Moreno, do -- do you have any knowledge of the dealings concerning this construction project at issue between Allen Keller and C&B White Services, Inc.?

A   I don't know.

Q   So you weren't present during any conversations that Keller and C&B White Services, Inc., representatives had?

A   No.

Q   And you didn't -- you didn't overhear any

Page 96

phone calls or anything like that between those two entities?

A   No.

MR. HUDLER: Pass the witness.

MR. WOLLAM: I -- I have nothing further.

MR. SAWICKI: I just had one.

FURTHER EXAMINATION

BY MR. SAWICKI:

Q   How long had you known Martin before he died?

A   Two, perhaps three months.

Q   Was he a social friend of yours, as well as a coworker?

A   I -- I -- I had met him through other friends, yes, and that's how we met, you know. And, you know, all of us, we sort of know each other.

Q   How well did you know Martin before he died?

A   Not that well, because, I mean, I lived in Seguin and he lived in San Marcos. So we didn't know each other that well.

MR. SAWICKI: I pass the witness.

THE REPORTER: Anybody?

MR. SAWICKI: Todas.

Page 97

MR. HUDLER: We'll reserve for trial.

THE VIDEOGRAPHER: We're off the record at 2:15.

(Deposition concluded at 2:15 p.m.)

Page 99

I, ROBERT MORENO CASTILLO, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

_____
ROBERT MORENO CASTILLO

THE STATE OF TEXAS)

COUNTY OF TRAVIS )

Before me, _____, on this day personally appeared (description of identity card or other document) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this _____ day of _____, 2014.

_____
NOTARY PUBLIC IN AND FOR
THE STATE OF TEXAS

Page 98

CHANGES MADE TO DEPOSITION

No erasures or obliterations of any kind are to be made to the original testimony as transcribed by the deposition officer. Please enter the page number, line number and reason for such change or correction below.

WITNESS NAME: ROBERT MORENO CASTILLO
DATE OF DEPO: 1/16/14

PAGE        LINE          CHANGE          REASON

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

DATE                        ROBERT MORENO CASTILLO

Page 100

CAUSE NO. 13410

MARISELA G. SALAS,            *  IN THE DISTRICT COURT OF
individually AND AS           *
REPRESENTATIVE OF THE         *
ESTATE OF MARTIN SUAREZ       *
AND AS NEXT FRIEND OF         *
KEYLA MARIZEL SALAS           *
SUARES, minor                 *
                              *
VS.                           *  GILLESPIE COUNTY, TEXAS
                              *
C&B WHITE SERVICES, INC.,     *
ALLEN KELLER CO., 1 LLC       *
d/b/a ALLEN KELLER CO.;       *
ALLEN KELLER CO. SAFECO       *
INSURANCE COMPANY OF          *
AMERICA                       *  216TH JUDICIAL DISTRICT

REPORTER'S CERTIFICATION
VIDEO/INTERPRETED/ORAL DEPOSITION OF
ROBERT MORENO CASTILLO
JANUARY 16, 2014

I, Rhonda Howard, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the witness, ROBERT MORENO CASTILLO, was duly sworn by the deposition officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

That the transcript was submitted on _____ to Mr. Zachary Hudler, LAW OFFICES OF ZACHARY P. HUDLER, P.C., 100 East Pecan, Suite 1, Johnson City, Texas, 78656, (830) 868-7651,



**Page 101**

for the witness's examination, signature and return to me by _____;

That the time used by attorneys is as follows:

Mr. Erik Wollam - 1:35
Mr. Michael Sawicki - 1:04
Mr. Zach Hudler - :07

That pursuant to information given to the deposition officer at the time testimony was taken, the following includes counsel for all parties of record:

Mr. Michael Sawicki, Attorney for Plaintiff
Mr. Erik Wollam, Attorney for Defendant
Mr. Zach Hudler, Attorney for C&B White

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Further certification requirements pursuant to Rule 203 of TRCP will be certified to after they have occurred.

**Page 102**

Certified to by me, this 27th day of January, 2014.

RHONDA HOWARD, Texas CSR No. 4136
Expiration Date 12/31/14
FIRM REGISTRATION NO: 283
ESQUIRE DEPOSITION SERVICES
100 Congress, Suite 2000
Austin, Texas 78701
(512) 328-5557

Job No. 18143 RH

**Page 103**

FURTHER CERTIFICATION UNDER RULE 203 TRCP

The original deposition ( ) was ( ) was not returned to the deposition officer on _____.

If returned, the attached Changes and Signature page contains any changes and the reasons therefor;

If returned the original deposition was delivered to Mr. Erik Wollam, Custodial Attorney;

That $_____ is the deposition officer's charge to the Defendant, Allen Keller, for preparing the original deposition transcript and any copies of exhibits;

That the deposition was delivered in accordance with Rule 203.3, and that a copy of the certificate was served on all parties shown herein and filed with the Clerk.

Certified to by me this      day of      , 2014.

Rhonda Howard, Texas CSR No. 4136
Expiration Date: 12/31/14
FIRM REGISTRATION NO. 283
ESQUIRE DEPOSITION SERVICES
3101 Bee Caves Road, Suite 220
Austin, Texas 78746
(512) 328-5557

Job No. 18143 RH